# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| AMY KOGAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 2:16-cv-04067-NKL ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) ) |
| Defendant. | ) ) |

## ORDER

Plaintiff Amy Kogan appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income. The decision is reversed and the case remanded for award of benefits.

### I. Background

Kogan was born in 1971, is a high school graduate, and took one year of college. She has most recently worked as a part-time floral worker and part-time relief cook, and farther in the past worked as a telephone operator and a hotel security guard. Kogan alleges she became disabled beginning on June 30, 2011 due to medical and psychiatric conditions. In this appeal, she focuses on her psychiatric conditions.

### A. Medical history

Kogan began seeing Nancy Pope, a licensed professional counselor, at Pathways Community Behavioral Healthcare in May 2011. Kogan described her sleep as very poor, with nightmares and frequent awakenings. She reported poor appetite, anhedonia, lethargy, poor

concentration, frequent crying, and suicidal ideation. Pope noted there was no evidence of psychotic features, but that the sleep problems might indicate a mood disorder.

Kogan saw Pope again on May 25, 2011. Pope noted Kogan's flat affect and monotone speech, and provided grief counseling in connection with Kogan's loss of her grandmother. Kogan followed up with her primary care physician, Dr. Neill, the same day. The doctor diagnosed depression and prescribed Paroxetine and instructed Kogan to continue seeing her therapist at Pathways.

At the request of Dr. Neill, Kogan saw Steven Adelman, Psy.D., in June 2011 for a psychological assessment. Kogan reported her history of anxiety and grief, cluster headaches, and sleep disturbances. Dr. Adelman noted Kogan appeared moderately depressed and seemed to be suffering from sleep deprivation. His assessment included adjustment disorder and cluster headaches, and he wanted to rule out a sleep disorder. He opined that Kogan might have problems dealing with detailed instructions or withstanding the normal stress of the workplace.

Kogan followed up with Dr. Neill in July 2011 for her depression symptoms. She reported that her depressed mood had improved a little and that the continued therapy sessions had been helpful. She still had sleep difficulties, anhedonia, low appetite, poor focus, and migraines. The doctor diagnosed depression, migraine, and insomnia, and prescribed Topomax and Trazadone, in addition to continuing her other medications. At a visit in August 2011, Dr. Neill continued the Topomax, to help with headaches and possibly stabilize Kogan's mood.

She continued to see Nancy Pope for individual therapy sessions throughout 2011. In July, Pope observed flat affect and frequent crying throughout the session. In August, Kogan reported feeling happier, but in September, reported feelings of low self-esteem and worthlessness. In September, they reviewed coping strategies, and in early October, Pope noted

2

Kogan's depression was continuing toward stability. But in later October, Kogan reported a renewal of depression in connection with looking for work. In November, Pope observed increased symptoms of depression. At a December 1 visit, Kogan reported feeling very sad and hopeless, and expressed a death wish but no plan for self-harm. At a December 10 visit, Pope characterized Kogan's depression as significant and gave her information about crisis hotlines.

Kogan continued to see Pope throughout 2012. Kogan reported suicidal ideation in January. She reported improvement in her depression in early February, but that she also had poor sleep and suicidal ideation. On February 20, Pope noted Kogan appeared distressed, was stuttering and losing words, and that her judgment and insight were questionable. Kogan said she had not slept for three nights and disclosed that she had been hurting herself by cutting. They discussed the possibility of hospitalization, but Kogan did not want to pursue that option out of fear of alienating family members. On February 27, Pope noted Kogan was "acutely depressed." Tr. 583.

On March 2, 2012, Kogan saw Dr. Judith Grimmond at Pathways to discuss medication. Kogan reported continued cutting and that she wished she was dead. The doctor's assessment was major depressive disorder and anxiety disorder, with a GAF of 55. She prescribed medication for anxiety and sleeplessness, and advised that Kogan continue therapy.

On March 5, 2012, Kogan appeared at Pope's office with fresh cuts on her arms, and reporting continuing depression and feelings of numbness and indifference. On March 12, in addition to insomnia, she reported an apparition or dream of a deceased male friend. A few days later at a visit with Dr. Grimmond, she reported that she thought she saw people when she experienced significant sleep deprivation. On March 30, she told Dr. Grimmond that her thoughts were clearer, but she continued to have nightmares, visions, and "wild dreams." Tr.

3

548. Pope described Kogan's mood as dysphoric on April 24, and lethargic on May 7. At a visit with Dr. Neill on May 7, the doctor diagnosed depression and insomnia, among other things. At a May 29 visit, Pope noted Kogan displayed significant depression and fresh cuts, and noted her symptoms were "quite unremitting." Tr. 617. In July, Pope noted Kogan had psychomotor retardation, racing thoughts, restless sleep, numbness, and anhedonia.

Dr. Grimmond transferred Kogan's psychiatric care to psychiatrist Satnam Mahal, M.D. In July 2012, Dr. Mahal observed that Kogan had continuing depression, low energy, poor motivation, difficulty focusing on tasks, and visual hallucinations. He noted that Kogan was "easily distractible and had to have questions repeated to her several times[.]" Tr. 585. He diagnosed major depressive disorder—recurrent with psychotic features, migraines, and obesity, and assigned a GAF score of 50. He instructed Kogan to continue attending individual therapy and taking Paxil, Abilify, and Trazadone. At an August visit, Dr. Mahal noted Kogan's affect was somewhat blunted; she reported different voices telling her negative things.

At a July 30, 2012 session with Pope, Kogan reported suffering a great deal of stress. She told Pope that in stressful conditions, she had visual hallucinations that she called "gravelings," which she characterized as neither kind nor malevolent. Tr. 527. At a session with Pope on August 20, Kogan said the gravelings and dark shadows were still present, but had become quieter. Pope noted that Kogan still exhibited psychomotor retardation and questionable insight. At an August 27 session with Pope, Kogan reported waking, seeing her deceased grandmother on her bed, and discovering that the vision was an "evil substitute." Tr. 614. Pope noted Kogan had been suffering from auditory and visual hallucinations, insomnia, and repeated self-harming behavior, and opined that Kogan's exhaustion seemed to have worsened the psychotic features of her depression.

4

In October 2012, Kogan told Dr. Mahal that the voices were much reduced and she was hearing only mumbles at times. The doctor noted her mood was fairly stable. In November 2012, Kogan told Dr. Mahal she was feeling "fairly okay," and the doctor continued her medications and instruction to participate in therapy with Pope, which Kogan did. At a December 2012 visit with Pope, Kogan described an increase in auditory and visual hallucinations. Pope noted depressed mood and anxiety.

Dr. Mahal saw Kogan approximately monthly throughout 2013. When he recorded the status of Kogan's ability to concentrate, he described it as poor in March, June, September, and November; fair in January and July; and the December record first states "poor," then "fair." Tr. 647, 911, 891, 868, 841, and 814. In March 2013, Dr. Mahal added, under "Plan" and in connection with continuing Kogan's psychotropic medications, that Kogan's depression and psychotic features were "resistant." Tr. 666. All of Dr. Mahal's records of Kogan's treatment after March 2013 contain that same note. Tr. 698, 911, 891, 868, 841, 814, and 780. Kogan continued to report auditory and visual hallucinations to Dr. Mahal throughout 2013, as well as night terrors and fleeting suicidal thoughts. The doctor's records also document depressed mood, low energy, and other symptoms. Tr. 569, 586, 619, 635, 646, 665, 666, 697, 698, 841, and 867.

Kogan began to receive community support visits at least a few times a month from Pathways' Amanda Burrow in 2013. Kogan worked with Burrow on symptom management, such as reviewing techniques for management of anxiety, avoiding the urge to cut, and trying to identify triggers, among other things. Tr. 660. They discussed Kogan's lack of support from her family, who did not believe in mental health treatment. Burrow usually went to Kogan's home, but Burrow also went with Kogan to some psychiatric appointments with Dr. Mahal, including

5

appointments in March and April 2013. At the March appointment, Burrow noted Kogan's speech became slurred during the visit, and that Kogan said it was due to a medication she had just taken for anxiety. Also during the appointment, Burrow had to remind Kogan to tell the doctor about a symptom of shakiness that she had had. Dr. Mahal made a medication adjustment. Tr. 781-82. At the April appointment with Dr. Mahal, Kogan initially reported she was doing well and did not want to change her medications, but after encouragement from Burrow to share more, Kogan reported recent symptoms and mood changes, and the doctor made a medication adjustment. Tr. 700-01.

Kogan also continued to receive therapy from Pope in 2013. Kogan continued to have anxiety, thoughts of self-harm, and hallucinations. At a visit in February, Kogan disclosed that she had experienced her first hallucination when she was in sixth or seventh grade, was "really freaked out," and that an aunt gave her a marijuana joint to calm her down. Tr. 658. Kogan said that the voices she hears could increase in volume and would not quiet unless she cut herself, then "the voices will become like a mouse but even the mouse's laughter is evil like 'look what you did.'" *Id.* In early April, Kogan reported an increase in voices telling her to harm herself. A few weeks later, Kogan and Pope discussed the possibility of hospitalization, but Kogan decided not to go due to fear of her family's disapproval. In July, Pope observed that Kogan was "having trouble with concentration, memory and some confusion." Tr. 897. Kogan's mother joined in an August visit, telling Pope that Kogan had been disoriented and confused, and that she (the mother) had taken over Kogan's medications out of concern that Kogan could not make decisions herself. Pope observed that Kogan's thought processes were disorganized and that she could not find words. Pope noted in September 2013 that Kogan's thought processes were much improved, but that at the same visit, Kogan had no memory of the prior month's visit.

Kogan continued to regularly see Dr. Mahal, Pope, and Burrow in 2014. In February, Pope noted Kogan had been cutting as recently as the month before, and was reporting passive suicidal ideation such as wishing she was dead. Kogan had an elevated score on a depression scale administered by Pope. In March, Pope noted Kogan had a flat affect and lacked animation; Kogan described dreams in which she killed family members and reported hearing loud voices.

In March 2014, Kogan reported to Dr. Mahal that she was hearing voices that were very derogatory and saying mean things to her. The doctor adjusted her medication, noted resistant depression and psychotic features, and instructed her to continue seeing Pope for individual therapy. Throughout Dr. Mahal's two-year course of treatment of Kogan, he consistently diagnosed her with major depressive disorder—recurrent with psychotic features, and assigned GAF scores of 50-52.

On November 6, 2014, Kogan told her counselor at Pathways that she had suicidal ideation and thoughts of taking all of her medications in a suicide attempt. She was transferred to the emergency room at Lake Regional Health System for further evaluation. Her labs were reassuring and she was discharged in stable condition for transfer to a psychiatric facility on a voluntary basis. Tr. 1038-41.

### B. Kogan's testimony

Kogan testified at the hearing of April 28, 2014. She described her symptoms of depression and anxiety with psychotic features, and struggles with "malevolent" auditory hallucinations that told her to hurt herself or others. Tr. 91. She said that medication and therapeutic techniques help keep the auditory hallucinations in check, but the voices were constant. She had nightmares that interrupt her sleep and got less than five hours of sleep per 24-horu period. Her constant fatigue and some of her psychiatric medications affected her

7

concentration, as did her physical impairments. She had a compulsion to self-harm and had last cut herself two weeks before the hearing. She had a support aide from Pathways who took her to medical appointments, and an aide from Integris Home Health Care who came five days a week, for a couple of hours per day, to help with general cleaning, laundry and hygiene. She drove to the grocery store and doctor office when she was able.

C. **Expert opinions**

In a Medical Source Statement—Mental completed by Dr. Mahal on March 12, 2014, the doctor assessed Kogan's mental limitations as follows: moderately to markedly limited in all aspects of understanding and memory; moderately to extremely limited in all aspects of sustained concentration and persistence, especially in the ability to complete a normal workday without interruption from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; moderately to markedly limited in all aspects of social interaction; and moderately to markedly limited in all aspects of adaptation. Her diagnoses were major depressive disorder—recurrent with psychotic features, migraines, back pain, and obesity. Tr. 718-19. The ALJ gave Dr. Mahal's opinion little weight.

On July 15, 2014, Jennifer Stevens, Psy.D., performed a psychological evaluation and mental status examination at the request of the ALJ. Dr. Stevens also reviewed records from Pathways (those of Pope and Dr. Mahal). Dr. Stevens wrote that Kogan denied self-injurious behavior, despite evidence of cutting. Kogan also denied sleep difficulties. She spoke in a monotone and exhibited a depressed mood and affect, and appeared lethargic. She described seeing shadows. Dr. Stevens observed that Kogan's abstract reasoning appeared limited. *Id*. Dr. Stevens opined that Kogan was able to understand and remember at least simple instructions and could relate to others in a predictable manner, as she has the ability to understand social

8

nuances. Dr. Stevens further opined that, psychologically, Kogan had the ability to use adequate pace and persistence regarding task completion and that she was able to manage her own money. Dr. Stevens also opined that Kogan had no limitations in the ability to understand and remember simple instructions, or any limitations in the ability to interact appropriately with coworkers. Dr. Stevens diagnosed persistent depressive disorder. Tr. 987-90. The ALJ gave great weight to the portion of the opinion finding Kogan could understand and remember simple instructions and use adequate pace and persistence to complete tasks, but gave little weight to Stevens' findings that Kogan could had no limitations in any work related tasks with respect to ability to relate in a predictable manner and understand social nuances.

In May 2013, a state agency psychological consultant reviewed records and concluded Kogan could acquire and retain simple instructions, sustain concentration and persistence with simple, repetitive tasks, and adapt to changes in work settings that do not require frequent public contact or very close contact with others in the workplace. Tr. 132. The ALJ gave the consultant's opinion significant weight.

A vocational expert testified at the hearing. The ALJ proposed a hypothetical individual with the following limitations: could do a full range of sedentary work with additional functional limitations; could stand no more than 15 minutes at any one time; cannot push or pull levers with her upper or lower extremities, bilaterally; cannot push foot pedals with her lower extremities, bilaterally; cannot reach above her shoulders with her upper extremities, bilaterally; reaching to the front or side, bilaterally, is limited to frequent; bending, twisting, and turning, whether seated or standing, is limited to occasional; she could perform the following activities no more than 15 percent of the workday: stooping, squatting, crouching, or climbing stairs; cannot crawl, kneel, climb ropes, ladders, or scaffolds; can grip and grasp, with wrist movements, frequently; handle,

9

finger, and feel frequently, bilaterally; cannot use air or vibrating tools or motor vehicles; cannot work at hazards or unprotected heights; cannot work in extremes of cold or heat or high humidity; cannot make judgments on complex work-related decisions (not a cognitive issue, but a concentration issue); can have no contact with the public; contact with coworkers and supervisors should be no more than occasional; and cannot respond appropriately to changes in a work routine setting that involve complex instructions or tasks. Tr. 107-108. The VE testified that such a person could not perform Kogan's past relevant work, but could perform work as a final assembler or jewelry painter.

The VE also reviewed the Medical Source Statement---Mental, prepared by Dr. Mahal, and testified that a person with the limitations indicated would not be able to work. Tr. 111. The VE further testified that no work would be available for a person who could not concentrate on simple tasks for two hours. Tr. 112.

### D. The ALJ's Decision

The ALJ found that during the relevant period, Kogan had severe impairments of lumbar degenerative disc disease status post fusion and diskectomy, headaches, asthma, gastro-esophageal reflux disease, venous insufficiency, major depressive disorder with psychotic features, anxiety disorder, and morbid obesity. He concluded Kogan had the residual functional capacity to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can stand no more than 15 minutes at any one time. She cannot push foot pedals with the bilateral lower extremities, push or pull levers with the bilateral upper extremities, reach above the shoulders with the bilateral upper extremities, crawl, kneel, or climb ladders, ropes, or scaffolds. She can stoop, crouch, squat, and climb stairs up to 15 percent of the workday. She can occasionally bend, twist, and turn when sitting or standing with frequent reaching to the front or side bilaterally. She can frequently handle, finger, feel, grip, grasp, and perform wrist

10

> movements bilaterally, but cannot use motor vehicles or air or vibrating tools. She cannot work at hazards or unprotected heights, or be exposed to temperature extremes of cold or heat, humidity, or the outdoors. She can never make judgments on complex work-related instructions, respond appropriately to changes in a routine work setting that involve complex instructions or tasks, or have contact with the public, and can only interact occasionally with coworkers and supervisors.

Tr. 55-56

The ALJ determined Kogan is not capable of performing past relevant work, but can do other jobs that exist in significant numbers in the local and national economy, such as final assembler and jewelry painter.

## II. Discussion

Kogan challenges the ALJ's decision to give her treating psychiatrist's opinion little weight and the non-examining psychologist's opinion great weight.[1] She asks for reversal and award of benefits, or remand for further proceedings.[2]

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915. Here, the findings

---

[1] In her opening brief, Kogan also challenged the ALJ's evaluation of the vocational expert's testimony. She withdrew that challenge in her reply brief. Doc. 13, p. 7 of 9.
[2] The Conclusion portions of Kogan's opening and reply briefs expressly ask for remand for a new hearing but do not expressly request an award of benefits. Doc. 9, pp. 30-31, and Doc. 13, p. 8 of 9. On the other hand, Kogan expressly asks in the Argument sections of both briefs for award of benefits. Doc. 9, p. 25 of 31, and Doc. 13, p. 7 of 9.

11

are not supported by substantial evidence on the whole record.

Factors considered in weighing medical opinion evidence include the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.927. An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). The opinion may be given "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id.* (citations omitted). And the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)).

Dr. Mahal is the only treating medical source to provide an opinion about Kogan's mental functioning. His opinion was entitled to controlling weight. Dr. Mahal treated Kogan for two years, on a regular basis. The record reflects at least 13 in–person appointments. He assessed Kogan's mental status, prescribed and adjusted psychotropic medications, and consistently diagnosed major depressive disorder—recurrent with psychotic features, noted her symptoms were resistant to treatment, and instructed her to participate in individual therapy. Dr. Mahal made a record of Kogan's descriptions of her symptoms and functioning, and his observations and assessments of Kogan, visit-to-visit. His observations and assessments often

12

included a description of Kogan's concentration as poor, and sometimes as fair. His opinion concerning Kogan's moderate to marked limitations in understanding and memory, sustained concentration and persistence, social interaction, and ability to adapt, and extreme limitation in ability to complete a normal workday and workweek without interruption from psychologically based symptoms, is consistent with his treatment records.

Dr. Mahal's opinion is also consistent with the other substantial evidence on the whole record, including records of years of individual therapy that Kogan received from Ms. Pope, a licensed professional counselor. Pope's records repeatedly and consistently note Kogan suffered from suicidal ideation, psychotic features, slowed and disorganized thought processes, and deficiencies in concentration. Pope observed self-inflicted cuts on Kogan's arms. Pope discussed hospitalization with Kogan on occasion, which Kogan declined due to fear of her family's disapproval. Pope's most recent records in evidence reflect her observation that Kogan had recently been cutting, wished she was dead, had an elevated score on a depression scale, had dreams of killing family members, and continued to hear loud voices.

Dr. Mahal's opinion is consistent with records regarding Kogan's receipt of community support services from Pathways. Those records reflect assistance with management of anxiety, avoiding the urge to cut, and trying to identify triggers, among other things; and even her receipt of support at appointments with Dr. Mahal in order to fully describe her symptoms. Hospital records from November 2014 also document that she was evaluated in the emergency room after expressing suicidal ideation and thinking of taking all of her medications at once.

In addition, Dr. Mahal's opinion is entitled to greater weight because he is a specialist, a psychiatrist, offering an opinion in the area of his specialty. *Brown v. Astrue,* 611 F.3d 941, 953 (8th Cir. 2010); 20 C.F.R. §§ 404.1527, 416.927.

Further, his opinion is not inconsistent with other substantial evidence on the whole record. The ALJ did rely on evidence that Kogan was doing better at times. The ALJ noted, for example, instances from May 2011 through 2014 when Kogan had good eye contact, linear flow of thought, was dressed appropriately, admitted that the voices were only soft, was pleasant and had normal affect, spontaneously laughed, could do a math problem in her head, and was not thinking about suicide. Tr. 58-60. The ALJ further noted that Kogan could perform self-care activities, paint, draw, drive, use a computer, help her family, and make crafts. But such evidence is not substantial evidence on the whole record that demonstrates Kogan is better, and free from disabling limitations. It is reflective of the fact that mental impairments can wax and wane throughout the course of treatment. *Nowling v. Colvin,* 813 F.3d 1110, 1123 (8th Cir. 2016); *see also Hutsell v. Massanari,* 259 F.3d 707, 713 (8th Cir. 2001) (claimant's activities of daily living, including cooking, cleaning, doing laundry, visiting friends, watching television, reading the newspaper, and listening to the radio were consistent with chronic mental instability). Indeed, as noted above, the most recent records reflect Kogan continues to cut, has suicidal ideation, hears loud voices, has had dreams of killing family members, and had to be seen in an emergency room when she had thoughts of taking all her medications at once. Furthermore, to the extent Kogan did do better from time to time, the ALJ failed to acknowledge that she receives extensive supportive services, and failed to consider how she might do outside of that structure. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1200.F ("If your symptomatology is controlled or attenuated by psychosocial factors, *we must consider* your ability to function outside your highly structured settings." (emphasis added)).

The other medical opinion evidence of record does not change the above analysis. Dr. Stevens saw Kogan once; the state agency psychological consultant never saw Kogan.

14

Dr. Stevens opined that Kogan could understand and remember at least simple instructions, and did not find any other limitations, notwithstanding Dr. Stevens' observations that Kogan denied self-harm behaviors despite contrary medical evidence, spoke in a monotone, appeared lethargic, had a depressed mood and affect, had limited abstract reasoning, and said she saw shadows. The state agency psychological consultant identified only some limitations, opining that Kogan could acquire and retain simple instructions, sustain concentration and persistence with simple, repetitive tasks, and adapt to changes in work settings that do not require frequent public contact or very close contact with others in the workplace.

Generally, the opinion of a consulting physician who examines a claimant only once is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion. *Charles v. Barnhart,* 375 F.3d 777, 783 (8th Cir. 2004) (*citing Lauer v. Apfel,* 245 F.3d 700, 705 (8th Cir. 2001), and *Onstead v. Sullivan,* 962 F.2d 803, 805 (8th Cir. 1992)). But an ALJ may consider the opinion of a consulting examiner "as one factor in determining the nature and severity of a claimant's impairment." *Charles,* 375 F.3d at 783 (*citing Harris v. Barnhart,* 356 F.3d 926, 931 (8th Cir. 2004), and 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)).

Because Dr. Stevens and the state agency consultant had no treating relationship with Kogan, and examined Kogan only once or not at all, and their opinions are inconsistent with Dr. Mahal's, they are not substantial evidence and do not demonstrate the Dr. Mahal's opinion was entitled to less than controlling weight. The ALJ could properly consider the opinions as factors in determining the nature and severity of Kogan's impairment. But the ALJ did not give any weight to the part of Dr. Stevens' determination in which she opined that Kogan had no limitations in any work related tasks with respect to ability to relate in a predictable manner and

15

understand social nuances. As the ALJ noted, Dr. Stevens' exam findings reflected "greater difficulties" than her ultimate opinion reflected. Tr. 62. Dr. Stevens' opinion thus at least partially supports Dr. Mahal's opinion, by the ALJ's own analysis.

As for the state agency consultant's opinion, the Court notes it does not reference Dr. Mahal's treatment notes, and was prepared in May 2013. The consultant's opinion does not reflect the longitudinal perspective that Dr. Mahal's opinion does, nor does it address over a year of Kogan's treatment records, including the most recent developments in Kogan's history, discussed above.

The ALJ did not give good reasons for discounting Dr. Mahal's opinion. It was entitled to controlling weight. The vocational expert agreed that a person with Kogan's mental health limitations as described by Dr. Mahal would not be able to work. Accordingly, the decision is reversed, and the case remanded for award of benefits.

### III. Conclusion

The Commissioner's decision is reversed and benefits shall be awarded. The matter is remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: October 11, 2016  
Jefferson City, Missouri